No. 02-451

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 325

IN RE THE ESTATE OF EVERETT T. ORR

Deceased.

APPEAL FROM:     District Court of the Ninth Judicial District,
                 In and for the County of Pondera,
                 The Honorable Marc G. Buyske, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

            Kenneth R. Olson, Great Falls, Montana

        For Respondent:

            Scott O. Swanson, Pendroy,  Montana

                                    Submitted on Briefs:  November 21, 2002

                                    Decided:  December 19, 2002

Filed:

_____
                        Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1	Three daughters of the decedent Everett Orr filed timely creditor's claims against their father's Estate claiming a right to be repaid for personal care services provided prior to their father's death. The Estate denied their claims as did the District Court. The daughters appeal. We affirm.

## ISSUE

¶2	The sole issue before this Court is whether the District Court erred in finding there was no agreement between the Claimant daughters and the decedent, whereby they would be compensated for the personal care services they provided to their father prior to his death.

## FACTUAL BACKGROUND

¶3	Everett T. "Jazz" Orr died at the age of 79 on January 8, 2001. Mr. Orr's wife, Marjorie, had died on July 4, 2000. Their eight adult children survive them. In July 2000, Jazz Orr executed a holographic will that was subsequently replaced by his Last Will and Testament executed on September 21, 2000. It is undisputed that both wills contain substantially similar terms. On January 5, 2001, Jazz created yet another will in which he named a personal representative to his Estate but did not change the distribution of his assets among his children. This latter will was not signed. Therefore, the September, 2000 will was admitted to probate.

¶4	In all three wills, Jazz devised $1,000 each to three of his daughters, Glenna, Ida Mae and Viola. He also devised his saddle to Glenna and a wood carving to Viola. Additionally, he devised $2,000 each to daughters Beatrice and Donna. He gave his house and land, valued at approximately $40,000, to his son Tony, and his cattle brand to his son Ted. Lastly, he gave all remaining money after payment of debts and expenses (approximately $100,000), to his three sons, Tony, Ted, and Jim, to be divided equally.

2

¶5    Beatrice, Donna, and Viola (the Claimant daughters), claim they began assisting their father with some of his basic daily care needs such as cleaning, cooking, paying bills, arranging for medical care and the like, following their mother's death. Donna claims that from July 4, 2000 until August 16, 2000, she provided her father with 24-hour care with a few exceptions. During those times she was away, she professes that Viola or Beatrice would stay with their father. Around August 16, Jazz Orr decided he wished to stay alone at night, so from August 16 until September 4, Donna claims she stayed with her father until around nine or ten p.m., returning the next day around seven a.m. Donna asserts that her father indicated that he did not want to go to a rest home or to die without any money, and that he would "take care of [her] in [his] will."

¶6    On September 4, 2000, Jazz Orr fell and was injured. The Claimant daughters allege that after this fall, his daily care needs greatly increased and more personal care such as bathing and toilet assistance was required. Donna maintains that from September 5 until September 12, she once again provided 24-hour assistance. During the time Donna was caring for her father from July until mid-September, she claims she was unable to work at her insurance office and reports that her family's economic circumstances deteriorated for lack of income.

¶7    Beatrice became her father's primary care-giver on September 12 and continued such care until his death on January 8, 2001. On the days she had to work, she would travel to her job in Great Falls but maintains that she would return after work and stay with him. When she was unable to be there overnight, she asserts that she arranged for her brother, Ted, and his wife, Barbara, to stay with Jazz. During the time Beatrice cared for her father, she avers that he stated he "would take care of her" and that the money he had in various bank accounts would go to her and Donna.

¶8    Beginning around August 16, Viola claims she spent significant time assisting in the care of

3

her father and that she spent "five days per week, 24 hours per day, at [Jazz's] ranch." Viola claims she paid Ted and Barbara $100 per weekend to care for their father when Beatrice was unable to be there. In addition to paying Ted and Barbara for periodic care-giving services, Viola asserts that she made monthly payments to the local grocery store where family members charged groceries for Jazz Orr's use. She also made personal loans to two of her brothers at her father's request, with the understanding that she would be repaid out of her father's estate.

¶9 After their father's death, Donna submitted a claim for $9,600 to the Estate for payment. She maintains that this amount was less than the amount to which she was actually entitled, and is based on a $10.00 per hour sum for 960 hours. The $10.00 per hour amount was derived after determining that Westmont home care services charged $12.50 per hour for daytime care, and did not provide overnight at-home care at all. Beatrice submitted a claim for 1,020 hours at $10.00 per hour to the Estate for repayment, and Viola submitted a claim to the Estate for $8,000.

¶10 At a hearing on the Petition for Allowance of Claims held on February 4, 2002, in addition to the Claimant daughters, daughter Glenna and sons Tony and Jim testified, as did son Ted's wife, Barbara. These children, while agreeing that the three Claimant sisters spent time helping their father, disputed the amount of time Donna, Beatrice and Viola claimed to have spent. They also disagreed that their father needed around-the-clock care, found it very unlikely that their father would agree to pay any of his children to take care of him and allege that they, too, spent considerable time helping him and did not expect to be paid for such care. Moreover, daughter-in-law Barbara testified that she had offered to take a leave of absence from her job to provide Jazz with full-time care, if he would pay her the same amount as her salary, *i.e.*, $9.68 per hour. Jazz responded that he could not pay anyone to take care of him. Additionally, Barbara testified that all

the children were aware of the contents of Jazz's will and that "Jazz and Margie always said that the boys were to get the money."

¶11   On July 24, 2001, each of the daughters' creditor's claims against the Estate was disallowed. The Claimant daughters then filed their Petition for Allowance of Creditors' Claims with the Montana Ninth Judicial District Court on September 14, 2001.  A Hearing on the Petition was held on February 4, 2002, and on May 31, 2002, the District Court issued its Order denying the Petition. The Claimants filed a timely appeal with this Court.

## STANDARD OF REVIEW

¶12   We will not disturb a district court's findings of fact unless they are clearly erroneous. A court's findings are clearly erroneous if they are not supported by substantial credible evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed. We review a district court's conclusions of law to determine whether the interpretation of the law is correct. *In Re Estate of Hall*, 2002 MT 171, 310 Mont. 486, 51 P.3d 1134.

## DISCUSSION

¶13   The question presented to this Court has been presented to countless courts across this country: may a child recover from a deceased parent's estate for services provided by the child prior to the parent's death?  *See Leidig v. Coover's Executors* (1864), 47 Pa. 534; *Williams v. Barnes* (1832), 14 N.C. 348 [Devereux III, Vol. 14 N.C. at 305]; *Reynolds' Adm'rs v. Reynolds* (Ky. 1892), 18 S.W. 517.  The rule established in some of this country's earliest cases was widely adopted and is still embraced today.  It was succinctly stated by the early Corpus Jurisprudence digest thusly:

> The law regards with suspicion and disfavor a claim against the estate of a deceased person for personal services rendered by a relative, especially where the latter was a

5

member of the decedent's household, the presumption being that such services between persons occupying such relation are intended to be gratuitous, and such a claim therefore requires stronger proof to establish it than claims by strangers.

24 C.J. *Executors and Administrators* § 281 (1921) (currently 34 C.J.S. *Executors and Administrators* § 399).

¶14    Generally, it is true that when services are provided to one person by another and such services are knowingly and voluntarily accepted, the law presumes that the services were provided in expectation of payment. As indicated above, however, there is one generally acknowledged exception and the case at bar fits that exception--where a relative seeks payment for such services, the presumption is that the services were rendered gratuitously.

¶15    This long-standing rule was applied by this Court in *Donnes v. Orlando* (1986), 221 Mont. 356, 720 P.2d 233. In *Donnes*, the Court was asked to decide whether a nephew could recover from his uncle's estate for various work the nephew performed on his uncle's ranch prior to his uncle's death. After young Frank Donnes' father died, his uncle, also named Frank Donnes, took an active role in young Frank's life and they grew very close. Over the years and well into his adulthood, young Frank performed work around the ranch with no express understanding as to payment other than his uncle telling him he would "make it worthwhile." *Donnes*, 221 Mont. at 358-59, 720 P.2d at 235. When Uncle Frank died, young Frank submitted a claim against his uncle's estate for payment for some of the services rendered. The district court ruled that young Frank and his uncle "were so close [that] a presumption arose that [the] work was performed gratuitously." This Court affirmed the district court's holding.

¶16    In *Donnes*, we agreed with the district court's finding that young Frank had performed the work in question "[w]ithout there being any express understanding as to payment to Donnes, other than that the uncle would 'make it worthwhile,' and Donnes' feeling that this meant he would end up

6

receiving either money or a part of the ranch at sometime in the future." We held that this evidence was insufficient to justify an express or implied agreement that young Donnes would be paid for his work. *Donnes*, 221 Mont. at 363-64, 720 P.2d at 238.

¶17    As indicated in *Donnes*, the presumption that the services were rendered gratuitously can be rebutted with a showing of proof that there was an express agreement for payment of services or there exist "facts and circumstances from which such an agreement can be inferred." Additionally, a claimant must prove that a remuneration agreement existed "at the time the services were originally rendered." *Neumann v. Rogstad* (1988), 232 Mont. 24, 757 P.2d 761 (citing *San Antonio v. Spencer* (1928), 82 Mont. 9, 264 P. 944 and *Ziegler v. Kramer* (1977), 175 Mont. 236, 573 P.2d 644).

¶18    Donna, Beatrice and Viola all testified about non-specific comments and somewhat veiled "promises" allegedly made by their father to each of them personally, outside the presence of anyone else. Even if the District Court accepted their testimony as true, this testimony, as in *Donnes*, does not rise to the level of proof or evidence of an express or implied agreement that successfully rebuts the presumption. Moreover, and significantly, the District Court notes in its Order that the three daughters "admitted that services to Mr. Orr began due to filial relationship." Additionally, Donna testified that she would have performed these services for her father "if he hadn't had any money." Such admissions are fatal to a claim of express or implied contract for remuneration under these circumstances.

¶19    Finally, we note that Jazz Orr executed a second will on September 21, 2000, after Donna had provided care-giving services to him from July, 2000, through September 12. Had he wished to provide the allegedly-promised compensation from his Estate and guarantee its payment, the will

7

change on September 21 would have been a perfect opportunity to do so. Additionally, Jazz attempted to revise his will as late as January 5, three days before his death, but again constructed a will containing the same distributions as his two previous wills, which tends to undercut the claim that he wanted to compensate the three Claimants from his Estate.

¶20 We conclude the District Court did not err in denying the daughters' claims. Jazz Orr determined prior to his death how he wished to distribute the assets in his Estate, and the District Court correctly upheld his intent. *In Re Estate of Kuralt*, 2000 MT 359, 303 Mont. 335, 15 P.3d 931 ("Montana courts are guided by the bedrock principle of honoring the intent of the testator.") (citations omitted).

## CONCLUSION

¶21 The District Court was presented with substantial credible evidence with which to find that no implied or express contract for remuneration existed between the Claimants and Jazz Orr. Additionally, the court's conclusions of law stemming from those findings are correct. We therefore affirm.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART

8